## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **AUDREY DEPEIZA, as Proposed Representative of the Estate of ANDREW DEPEIZA, Deceased, and CHRISTINA MONIQUE CARTER-HARPER, as Next of Kin of AUBREY DREW CARTER, a minor and Surviving Daughter of ANDREW DEPEIZA, Deceased, Individually, NEQUITA GRIBBLE as Next of Kin of ZURI DEPEIZA, a Minor and Surviving Daughter of ANDREW DEPEIZA, deceased, and JASMINE JAMES as Next of Kin of ZION DEPEIZA and EZEKIEL ANDREW JAMES, Minor Children and Surviving Sons of ANDREW DEPEIZA, Deceased,** | **CIVIL ACTION FILE**<br><br>**NO. 1:18-CV-5117-MHC** |
|     **Plaintiffs,** | |
| **v.** | |
| **OFFICER JANET JACKSON, in her individual and official capacity, and OFFICER JOHN DOE, in his individual and official capacity,** | |
|     **Defendants.**[1] | |

---

[1] Since the filing of their Complaint for Damages [Doc. 1], Plaintiffs have not sought leave to amend the Complaint to substitute the identity of the unnamed Officer John Doe ("Doe") or otherwise indicated that such individual has been served. Therefore, the claims against Doe are **DISMISSED WITHOUT**

# ORDER

This case comes before the Court on Defendant Officer Janet Jackson

("Jackson")'s Motion for Summary Judgment [Doc. 45], Defendant Officer Janet

Jackson's Motion to File Out-of-Time Affidavit in Support of Her Motion for

Summary Judgment ("Motion to File Affidavit") [Doc. 46],[2] and Defendant's

Motion to Strike [Doc. 62].[3]

---

PREJUDICE.  See Wayne v. Jarvis, 197 F.3d 1098, 1102-03 (11th Cir. 1999) (upholding dismissal of John Doe defendants where Plaintiff failed to discover their identity prior to expiration of limitations period), overruled on other grounds by Manders v. Lee, 338 F.3d 1304, 1328 n.52 (11th Cir. 2003); see also Richardson v. Johnson, 598 F.3d 734, 738 (11th Cir. 2010) ("As a general matter, fictitious-party pleading is not permitted in federal court," unless a plaintiff describes the defendants with enough specificity to determine their identities.).

[2] Jackson proffers the affidavit of an eyewitness to the incident which Jackson acknowledges is not necessary to support her Motion for Summary Judgment because the eyewitness's account in consistent with Jackson's account.  Mot. to File Aff. ¶ 5.  Even assuming *arguendo* that Jackson has shown excusable neglect under Federal Rule of Civil Procedure 6(b)(1)(B), as explained herein the other undisputed evidence demonstrates that Jackson is entitled to judgment as a matter of law.  Thus, the Motion to File Affidavit is **DENIED AS MOOT**.

[3] The Court may strike "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" from "a pleading." FED. R. CIV. P. 12(f). Jackson's request is improperly characterized as a motion to strike because such motions may be made only regarding pleadings.  See id.  Unsworn statements, interview summaries, audio recordings of interviews, and other potential evidence are not pleadings within the meaning of Rule 12(f), as defined by Rule 7(a).  See FED. R. CIV. P. 7(a).  Consequently, Defendant's Motion to Strike is **DENIED**; however, the Court will consider Jackson's objections that the evidence should not be considered as needed.  See, e.g., Murphy v. Farmer, 176 F. Supp. 3d 1352, 1342

# I.    BACKGROUND[4]

This case arises from the fatal shooting of Andrew Depeiza ("Depeiza")

during an altercation with Jackson and other City of East Point Police Department

("EPPD") officers on the morning of November 11, 2016.

At about 1:30 a.m. on November 11, 2016, Jackson was dispatched to the

Legends of Laura Creek Apartments at 3200 Lakeview Place in East Point,

Georgia, in response to a reported fight between a male in a burgundy sweatshirt

and a female in a red t-shirt.  Decl. of Janet Jackson ("Jackson Decl.") ¶ 3; see also

Def.'s Resp. to Pls.' SMF [Doc. 55] ¶ 24.  Jackson and another EPPD officer,

---

(N.D. Ga. 2016); Exceptional Mktg. Grp., Inc. v. Jones, 749 F. Supp. 2d 1352, 1358-59 (N.D. Ga. 2010).

[4] At the outset, the Court notes that as this case is before it on Jackson's Motion for Summary Judgment, the Court views the evidence presented by the parties in the light most favorable to Plaintiffs and has drawn all justifiable inferences in favor of Plaintiffs.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Sunbeam TV Corp. v. Nielsen Media Research, Inc., 711 F.3d 1264, 1270 (11th Cir. 2013).  In addition, the Court has excluded assertions of facts that are immaterial or presented as arguments or legal conclusions or any fact not supported by citation to evidence (including page or paragraph number). LR 56.1B(1), NDGa.  Further, the Court accepts as admitted those facts in Defendant Officer Janet Jackson's Statement of Undisputed Material Facts ("Jackson's SUMF") [Doc. 45-1] that have not been specifically controverted with citation to the relevant portions of the record by Plaintiffs and those facts in Plaintiffs' Statement of Material Facts ("Pls.' SMF") [Doc. 51] that have not been specifically controverted with citation to the relevant portions of the record by Jackson.  See LR 56.1B(2), NDGa.

Corporal Cornelius Johnson ("Johnson"), arrived to find an individual who identified herself as Gabriel Graham ("Graham") in the parking lot wearing only a red t-shirt. Pls.' Resp. to Jackson's SUMF [Doc. 50-1] ¶ 9.

It appeared to Jackson that Graham was very frightened. Jackson Decl. ¶ 4. Graham told Jackson that a friend had come to Graham's apartment, consumed several drinks, became drunk, physically assaulted Graham and dragged Graham around her apartment, and refused to leave her apartment. Id.; see also Def.'s Resp. to Pls.' SMF ¶ 26. Graham described the man as a black male, "Jamaican," a big guy, wearing a burgundy shirt and black pants. Jackson Decl. ¶ 4; Def.'s Resp. to Pls.' SMF ¶ 31; Tr. Dep. Officer Janet Jackson ("Jackson Dep.") [Doc. 60] at 14. Graham could not recall the man's name, but later confirmed that the man was Depeiza. Pls.' Resp. to Jackson's SUMF ¶¶ 15-16. Jackson and Johnson accompanied Graham to her apartment, which was empty. Id. ¶ 19. Jackson noticed that a burner on the gas range was on high, and Graham stated that she had not turned it on. Jackson Decl. ¶ 5. Graham wanted to go to a friend's apartment in another part of the complex. Id.

Jackson drove Graham to a friend's apartment. Pls.' Resp. to Jackson's SUMF ¶ 22; Def.'s Resp. to Pls.' SMF ¶ 36. Graham pointed out that the man's vehicle, a green Mercury Mountaineer SUV, was still in the parking lot. Pls.'

4

Resp. to Jackson's SUMF ¶ 23.  Jackson ran the vehicle's license plate, learned that the vehicle was registered to Depeiza, and that Depeiza had a warrant out for his arrest for failure to register as a sex offender.  Jackson Decl. ¶ 6.  Jackson and Johnson searched the area but could not locate a man matching the description given by Graham, so they left the scene.  Id. ¶ 7; Def.'s Resp. to Pls.' SMF ¶ 37.

At about 3:15 a.m., approximately thirty minutes after leaving, Jackson and Johnson were dispatched back to the apartment complex in response to reports of a suspicious black man wearing a red or burgundy sweater who was banging on residents' doors asking for something.  Jackson Decl. ¶ 8.  Jackson was the first to arrive at the complex, and she saw a man pointing and saying, "He ran that way, hurry!"  Pls.' Resp. to Jackson's SUMF ¶ 29.  This witness described the man he had seen in the same way as the original caller.  Id. ¶ 30.  Jackson informed Johnson and EPPD Sargent Eric Seabolt ("Seabolt"), who had arrived at the complex shortly after Jackson, of the suspect's last known location and that he was running.  Jackson Decl. ¶ 9; Decl. of Lt. Eric Seabolt ("Seabolt Decl.") [Doc. 45-5] ¶ 4; Pls.' Resp. to Jackson's SUMF ¶ 33.  Seabolt was aware that Jackson had responded to a call earlier that night at the complex where the caller had reported being assaulted by a man wearing dark pants and a red or burgundy sweater.  Pls.' Resp. to Jackson's SUMF ¶¶ 35-36.  Seabolt also understood that the suspect that

was the subject of this call was said to have been wearing a red sweater and that there was an active warrant out for his arrest.  Id. ¶¶ 37-38.

As Seabolt drove through the apartment complex's parking lot, he saw a man standing in the bushes fifty feet in front of him wearing dark pants and a burgundy or maroon shirt.  Id. ¶¶ 39-40.  Seabolt alerted Jackson and Johnson and got out of his vehicle to approach the man.[5]  Seabolt Decl. ¶ 7.  Seabolt told the man to walk towards him, but the man asked "why?" and ran.  Id.  Seabolt attempted to follow but lost sight of the man.  Id.  Upon hearing Seabolt state that he had seen the man, Jackson went to the area where she heard Seabolt giving verbal commands and saw the man holding a glass bottle.  Jackson Decl. ¶ 10.  Jackson heard the man respond in a slurred state, "Why?  What did I do?", the man began running in Jackson's general direction, and he did not comply with Jackson's commands to stop.  Id.  Jackson advised Johnson to come to her location.  Id.

Jackson believed that the man, later identified as Depeiza, was likely the same person Graham had accused of assaulting her because of the similar description, the same location, the same time of the early morning, and the fact that

---

[5] All three officers wore their full EPPD uniforms and drove marked EPD vehicles. Seabolt Decl. ¶ 3; Jackson Decl. ¶ 6.

the man appeared to be looking for someone.  Jackson Decl. ¶ 16.  Jackson

intended to detain Depeiza long enough to question him about the incident with

Graham and the early morning banging on doors, while also confirming whether

the warrant for his arrest was valid.  Id.  The officers would have then decided

whether to arrest Depeiza.  Id.

The apartment complex had three levels (main, second, and third) above

ground and one level below ground level.  Pls.' Resp. to Jackson's SUMF ¶ 54.

The several staircases for access to the upper levels were divided into two sets of

stairs, separated by a concrete landing between each floor.  Id. ¶ 55.  Depeiza ran

up the stairs to building number two.  Jackson Decl. ¶ 11; Pls.' Resp. to Jackson's

SUMF ¶ 60.  The only way down was the same way Depeiza had gone up.

Jackson Decl. ¶ 11.  Jackson and Johnson followed Depeiza up the stairs,

continuing to give verbal commands to stop and get on the ground.  Id.  Jackson

advised Depeiza that the officers needed to speak with him for investigative

purposes, but Depeiza kept saying, "What did I do?"  Jackson Dep. at 75.  Johnson

had his taser drawn; Jackson did not have a taser.  Jackson Decl. ¶ 11.  Depeiza

eventually sat on the steps on the third level.  Id.; see also Jackson Dep. at 75.

Johnson and Jackson stopped on the landing between the second and third levels.

Pls.' Resp. to Jackson's SUMF ¶ 67.

Depeiza was a 30-year-old man, six feet and five inches tall, weighing 309 pounds. Id. ¶¶ 68, 70. Jackson is five feet and four inches tall and weighed 160 pounds at the time. Id. ¶ 4. Depeiza suddenly began to stand up aggressively as if preparing to lunge toward Jackson and Johnson. Jackson Decl. ¶ 12. Johnson deployed his taser, striking Depeiza in the chest. Id. Depeiza pulled out the prongs and lunged at the officers again. Id. Johnson backed up, and Jackson tried to hit Depeiza with her ASP baton,[6] but Depeiza kicked her in the face. Id.; Jackson Dep. at 99. Depeiza pressed Jackson into the railing and punched Jackson in the face and body repeatedly. Jackson Decl. ¶ 12; Jackson Dep. at 101-02. Jackson attempted to block her head and strike Depeiza with her ASP baton, but Depeiza grabbed the ASP baton from Jackson and threw it away. Jackson Decl. ¶ 12; Jackson Dep. at 101-02.

In her Declaration, Jackson states that she believes Johnson hit Depeiza from behind because Depeiza moved away from Jackson once and was then quickly back on Jackson. Jackson Decl. ¶ 13. Depeiza grabbed Jackson from the side around her shoulders and Jackson felt her feet begin to lift off the ground. Id. Jackson believed Depeiza was about to throw her over the railing to the ground and

---

[6] ASP refers to the company Armament Systems & Procedures which designs and manufactures batons and other products for law enforcement.

8

was in fear for her life.  Id.; Jackson Dep. at 147.  Jackson and Depeiza were two-and-a-half stories above the ground and there was a concrete sidewalk below them.  Pls.' Resp to Jackson's SUMF ¶ 80.

Jackson managed to reach her holstered service weapon, pointed it across her body, and fired once.  Jackson Decl. ¶ 14.  Because Depeiza did not let go, Jackson believed she had missed Depeiza and Jackson fired a second time.  Id.  The second gunshot struck Depeiza in the abdomen; he let go of Jackson and slumped to the floor.  Id.  Depeiza tried to reach for the ASP baton that he had grabbed from Jackson, and Jackson told Depeiza to please just stop and lie down.  Id.  Depeiza eventually became still but was still breathing.  Id.

Meanwhile, Seabolt located the building where Jackson, Johnson, and Depeiza were located and heard a Taser being deployed.  Seabolt Decl. ¶ 9.  As he made it to the stairs, Seabolt heard two gunshots.  Id.  Jackson and Johnson alerted Seabolt that it was safe to come up the stairs.  Pls.' Resp. to Jackson's SUMF ¶ 98.  Seabolt saw Depeiza lying on the concrete and bleeding from the abdomen.  Seabolt Decl. ¶ 10.  Seabolt called emergency services, which responded and transported Depeiza to Grady Hospital.  Id.  Depeiza did not survive his injuries.

The autopsy report shows that Depeiza suffered two gunshot wounds: one graze wound above the waistline and one fatal wound to the abdomen.  Pls.' Resp.

to Jackson's SUMF ¶ 108. The autopsy toxicology report shows that Depeiza had cocaine in his system at the time of his death and had a blood alcohol level of 0.138 grams per 100 ml. Id. ¶¶ 110-11.

On November 6, 2018, Plaintiffs[7] filed a Complaint for Damages [Doc. 1] against the City of East Point ("East Point"), Jackson, and Doe. On January 8, 2019, Plaintiffs filed an Amended Complaint for Damages [Doc. 5], asserting the following claims:

- Count I: 42 U.S.C. § 1983 – General Statement Regarding Claims (All Defendants)

- Count II: 42 U.S.C. § 1988 – Attorney's Fees (All Defendants)

- Count III: 42 U.S.C. § 1983 (All Defendants)[8]

- Count IV: 42 U.S.C. § 1983 – False Detention (Against Jackson and Doe, in their individual and official capacities) under the Fourth and Fourteenth Amendments

- Count V: 42 U.S.C. § 1983 (Against East Point)

---

[7] Later, on February 25, 2020, Plaintiffs filed a Second Amended Complaint for Damages [Doc. 49] adding as plaintiffs the parents of three other minor surviving children of Depeiza.

[8] As the Court noted in its April 19, 2019, Order [Doc. 14] at 7 n.3, Counts I and III are subsumed within the more specific counts alleging violations of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983.

- Count VI: 42 U.S.C. § 1983 – Excessive and Deadly Force (Against Jackson and Due, in their individual and official capacities) under the Fourth and Fourteenth Amendments

- Count VII: Negligence and Wrongful Death under Georgia Law (Against All Defendants)

On April 19, 2019, the Court granted East Point's Motion to Dismiss [Doc. 11] and dismissed East Point as a defendant. Apr. 19, 2019, Order at 13-14. On February 6, 2020, following the close of discovery, Jackson moved for summary judgment on all remaining claims against her. Jackson's Mot. for Summ. J. at 1-2.

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the district court in considering whether to grant summary judgment. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 255 (1986); see also Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).

If a movant meets its burden, the party opposing summary judgment must present evidence demonstrating a genuine issue of material fact or that the movant is not entitled to judgment as a matter of law. Celotex, 477 U.S. at 324. In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that opposing party. Anderson, 477 U.S. at 255; see also Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. Anderson, 477 U.S. at 248. A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. Anderson, 477 U.S. at 248. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. Matsushita, 475 U.S. at 587.

## III.  DISCUSSION

Jackson contends that Plaintiffs' federal claims brought pursuant to Section 1983 fail because she is entitled to qualified immunity, and Plaintiffs' state law claims fail because she is entitled to official immunity.  Am. Br. in Supp. of Def. Officer Janet Jackson's Mot. for Summ. J. ("Jackson's Am. Br.") [Doc. 47] at 2.

### A.    Section 1983 Claims Against Jackson in her Official Capacity

As an initial matter, a Section 1983 suit against an official of the government in his or her official capacity is deemed to be a suit against the entity that employs the official.  Ky. v. Graham, 473 U.S. 159, 165-66 (1985); see also Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1309 (11th Cir. 2009) (citing Brown v. Neumann, 188 F.3d 1289, 1290 (11th Cir. 1999)).  At the time of the incident, Jackson was employed by the EPPD.  Pls.' Resp. to Jackson's SUMF ¶ 2.  Thus, the claims against Jackson in her official capacity are claims against East Point.  See, e.g., Benjamin v. Thomas, No. 1:16-cv-1632-WSD, 2016 WL 5394118, at *2 (N.D. Ga. Sept. 27, 2016) (stating that claims against an Avondale Estates Police Department officer and the chief in their official capacities are claims against the City of Avondale Estates);  Greco v. Stone, No. 7:09-CV-156 (HL), 2011 WL 2550731, at *9 (N.D. Ga. June 24, 2011) (stating that a suit against two City of Moultrie Police Department officers in their official capacities was the equivalent of suing the City

13

of Moultrie). Because the Court previously dismissed the claims against East Point, the Section 1983 claims against Jackson in her official capacity are also **DISMISSED**.

### B. Section 1983 Claims Against Jackson in her Individual Capacity

Plaintiffs assert claims against Jackson in her individual capacity pursuant to Section 1983 for unlawfully detaining and seizing Depeiza and using excessive and deadly force against him. Pls.' Resp. in Opp'n to Def. Officer Janet Jackson's Mot. for Summ. J. ("Pls.' Opp'n") [Doc. 50] at 2. Jackson contends that Plaintiffs' false detention claim and excessive and deadly force claim are barred by qualified immunity. Jackson's Am. Br. at 14.

"Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Sherrod v. Johnson, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To claim qualified immunity, a defendant must first show he or she was performing a discretionary function. Moreno v. Turner, 572 F. App'x 852, 855 (11th Cir. 2014) (citing Whittier v. Kobayashi, 581 F.3d 1304, 1308 (11th Cir. 2009)).

> Instead of focusing on whether the acts in question involved the exercise of actual discretion, we assess whether they are of a type that

fell within the employee's job responsibilities. Our inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize.

Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265-66 (11th Cir. 2004) (citation omitted). Jackson contends, and Plaintiffs do not dispute, that Jackson was acting within the scope of her discretionary authority. See Jackson's Am. Br. at 15; see also Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (stating that there "can be no doubt" that the city police officer was acting within the scope of his discretionary authority when arresting the plaintiff).

"Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply." Edwards v. Shanley, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009)). A plaintiff demonstrates that qualified immunity does not apply by showing: "(1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged violation." Whittier, 581 F.3d at 1308.

A constitutional right is clearly established "only if its contours are 'sufficiently clear that a reasonable official would understand what he is doing violates that right.'" Vaughan v. Cox, 343 F.3d 1323, 1332 (11th Cir. 2003) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "When we consider

15

whether the law clearly established the relevant conduct as a constitutional violation at the time that [the government official] engaged in the challenged acts, we look for 'fair warning' to officers that the conduct at issue violated a constitutional right." Jones v. Fransen, 857 F.3d 843, 851 (11th Cir. 2017) (citing Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc)). There are three methods to show that the government official had fair warning:

> First, the plaintiffs may show that a materially similar case has already been decided. Second, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. Finally, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary. Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [relevant state supreme court].

Terrell v. Smith, 668 F.3d 1244, 1255-56 (11th Cir. 2012) (citations, quotation marks, and alterations omitted).

### 1.    Plaintiffs' False Detention Claim

Plaintiffs contend that Jackson unlawfully detained and seized Depeiza when she attempted to strike Depeiza with her ASP baton and when she shot Depeiza. Pls.' Opp'n at 6, 10. There is no dispute that Jackson attempted to detain Depeiza. See Jackson's Am. Br. at 16. Jackson intended to detain Depeiza long enough to question him about the incident with Graham and the early morning banging on doors, while confirming whether the warrant for Depeiza's arrest was valid.

Jackson Decl. ¶ 16. By attempting to strike Depeiza with her ASP baton and by shooting Depeiza, Jackson did in fact seize Depeiza. See Proescher v. Bell, 996 F. Supp. 2d 1350, 1363 (N.D. Ga. 2013) (citations omitted) ("A person is seized under the Fourth Amendment when a police officer, by means of intentional physical force or show of authority, terminates or restrains a person's freedom of movement."). The question is whether that seizure was lawful.

Jackson contends that the officers attempted to conduct an investigative stop of the kind permitted by Terry v. Ohio, 392 U.S. 1 (1968). Jackson's Am. Br. at 16-17.

> In Terry, the Supreme Court adopted a dual inquiry for evaluating the reasonableness of an investigative stop. Under Terry's two-part inquiry, we first examine whether the officer's action was justified at its inception, which turns on whether the officers had a reasonable suspicion that the defendant had engaged, or was about to engage, in a crime. In the second part of the inquiry, determining whether the stop went too far and matured into arrest before there was probable cause, we consider whether the stop was reasonably related in scope to the circumstances which justified the interference in the first place.

United States v. Acosta, 363 F.3d 1141, 1144-45 (11th Cir. 2004) (citations and internal quotation marks omitted). "In justifying such an intrusion, the 'reasonableness' standard requires that a police officer be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant that intrusion." United States v. Mikell, 102 F.3d

470, 474–75 (11th Cir.1996) (internal quotation marks omitted).  "Although an individual may ultimately be engaged in conduct that is perfectly lawful officers may detain the individual to resolve the ambiguity."  <u>Proescher</u>, 996 F. Supp. 2d at 1364 (alterations accepted, internal quotation marks omitted) (citing <u>United States v. Lewis</u>, 674 F.3d 1298, 1304 (11th Cir. 2012)).

The totality of the circumstances here, as established by the undisputed facts, support the existence of reasonable suspicion that Depeiza had engaged in a crime. Jackson had personally investigated an alleged assault upon Graham at the complex.  Graham described that the suspect was a black male, a big guy, wearing burgundy shirt and black pants.  Jackson Decl. ¶ 4; Def.'s Resp. to Pls.' SMF ¶ 31; Jackson Dep. at 14.  Graham told Jackson that the suspect had several drinks and became drunk.  Jackson Decl. ¶ 4; <u>see also</u> Def.'s Resp. to Pls.' SMF ¶ 26. Jackson's check of the suspect's vehicle's license plate showed that the vehicle was registered to Depeiza and there was an active warrant out for Depeiza's arrest. Jackson Decl. ¶ 6.  Jackson drove Graham to a friend's apartment at the complex. Pls.' Resp. to Jackson's SUMF ¶ 22; Def.'s Resp. to Pls.' SMF ¶ 36.

Later that morning, Jackson was dispatched back to the complex based on reports that a black man in a red or burgundy sweatshirt was banging on residents' doors in the complex asking for something.  Jackson Decl. ¶ 8.  As Seabolt drove

through the complex's parking lot, he saw a man wearing dark pants and a burgundy or maroon short standing in the bushes, and alerted Jackson of this. Seabolt Decl. ¶ 7. When Seabolt approached the man, he did not comply with Seabolt's commands. Id. The man ran in Jackson's general direction and did not comply with Jackson's commands to stop.[9] Jackson Decl. ¶ 10. Jackson saw the man holding a glass bottle and responding to Seabolt with slurred speech. Id. Jackson believed that the man, later identified as Depeiza, was likely the same person Graham had accused of assaulting her because of the similar description, the same location, the time of the early morning, and the fact that the man appeared to be looking for someone. See Jackson Decl. ¶ 16. These specific and articulable undisputed facts, when considered with the reasonable inferences made from them, gave Jackson reasonable suspicion that Depeiza was the suspect in the assault on Graham and that there was a warrant out for Depeiza's arrest.

### 2. Plaintiffs' Excessive and Deadly Force Claim

Plaintiffs contend that even if Jackson had a lawful reason to detain and seize Depeiza, the force Jackson used to do so was excessive. Pls.' Opp'n

---

[9] Plaintiffs contend that "it is undisputed that Mr. Depeiza did not have an understanding or appreciation of why he was being pursued by the police," but do not explain why this made Depeiza's detention unlawful. See Pls.' Opp'n at 6.

at 12-13.  According to Plaintiffs, Jackson initiated the use of violent force against Depeiza when Jackson attempted to strike Depeiza with her ASP baton "to stop [Depeiza] from fleeing and effectuate an actual arrest" when Depeiza "had exhibited no violent words or conduct" towards Jackson, Johnson, or Seabolt.  Id. at 13.  Plaintiffs contend that they present evidence from which a jury could conclude that Jackson "never thought she was in danger" when Depeiza "attempted to move past her when heading down the stairway."  Id.

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from excessive force during the course of a criminal apprehension."  Oliver v. Fiorino, 586 F.3d 898, 905 (11th Cir. 2009) (citations omitted).  "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."  Graham v. Connor, 490 U.S. 386, 395 (1989). Whether the force was "reasonable" "requires balancing of the individual's Fourth Amendment interests against the relevant government interests."  Cty. of Los Angeles v. Mendez, 137 S. Ct. 1539, 1546 (2017) (citing Graham, 490 U.S. at 396).  "The operative question in excessive force cases is 'whether the totality of the circumstances justifie[s] a particular sort of search or seizure.'"  Id.  (quoting

<u>Tennessee v. Garner</u>, 471 U.S. 1, 8-9 (1985)).  As the Supreme Court recently explained in <u>Mendez</u>,

> The reasonableness of the use of force is evaluated under an objective inquiry that pays careful attention to the facts and circumstances of each particular case.  And the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  Excessive force claims . . . are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred.  That inquiry is dispositive:  When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim.

<u>Id.</u> at 1546-47 (citations and quotations omitted).  "In deciding whether a police officer used excessive force, we pay 'careful attention to the facts and circumstances' of the case, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" <u>Morton v. Kirkwood</u>, 707 F.3d 1276, 1281 (11th Cir. 2013) (citing <u>Graham</u>, 490 U.S. at 396).

After Johnson and Jackson chased Depeiza up the stairs outside building number two, Depeiza sat down on the steps on the third level.  <u>See</u> Jackson Decl.

¶ 12; Jackson Dep. at 75.[10] Jackson and Johnson stopped on the landing between

the second and third levels. Pls.' Resp. to Jackson's SUMF ¶ 67. Depeiza began

to stand up aggressively as if preparing to lunge toward Jackson and Johnson.[11]

---

[10] Jackson contends that much of the evidence relied upon by Plaintiffs, including the Georgia Bureau of Investigation ("GBI")'s summaries of its interviews with Jackson ("Jackson GBI Summary") [Doc. 51-2], Johnson ("Johnson GBI Summary") [Doc. 51-3], and a witness, Marcella Willis ("Willis") ("Willis GBI Summary") [Doc. 51-9]; EPPD officers' reports ("EPPD Narratives") [Doc. 51-4]; and the audio recording of Johnson's GBI interview [Doc. 52] ("Johnson Recording") are inadmissible hearsay. See Def.'s Mot. to Strike at 4-5. However, as Jackson acknowledges in her reply in support of her summary judgment motion, even admitting these alleged hearsay statements does not create a genuine dispute of material fact. Jackson's Reply Br. in Supp. of Mot. for Summ J. [Doc. 56] at 9. Thus, this objection is immaterial and, to the extent the Court relies upon statements contained in the above-identified evidence in this Order, Jackson's objections to those statements are **OVERRULED**.

[11] Despite Plaintiffs' assertion to the contrary, there is no genuine factual dispute about whether Depeiza sat down on the stairs. See generally Pls.' Opp'n at 14. Jackson testified in her Deposition and stated in her Declaration that Depeiza sat down on the steps. See Jackson Decl. ¶ 11; Jackson Dep. at 75; see also Jackson GBI Summary at 6 ("Depeiza sat down . . . ."); EPPD Narrative #37 [Doc. 51-4 at 13-15] ("The suspect resisted the orders and eventually sat down on the step."). The fact that Willis and Johnson did not describe this specific detail when Jackson did is not evidence that Depeiza did not sit down. See generally Pls.' Resp. to Jackson's SUMF ¶ 66. Regardless, even if there is a factual dispute about whether Depeiza sat down, it is not material. The evidence, including that introduced by Plaintiffs, indicates that Depeiza moved towards Johnson and Jackson in an aggressive manner. See Jackson Decl. ¶ 12; EPPD Narrative #36 [Doc. 51-4 at 11-13] ("Within seconds the subject proceeded to advance toward Cpl. Johnson in an aggressive manner."); EPPD Narrative #37 ("The suspect stood, and took an aggressive stance, as it he was going to lunge toward us."); Willis GBI Summary at 1 ("WILLIS continued to watch as the black male subject lunged at the female officer and scuffle[d] with her. A black male officer tased the subject, but the

22

Jackson Decl. ¶ 12. Depeiza was a 30-year-old man, six feet and five inches tall, and weighed 309 pounds. Pls.' Resp. to Jackson's SUMF ¶¶ 68, 70. Jackson is five feet and four inches tall and weighed 160 pounds at the time of the incident. Id. ¶ 4. After Johnson deployed his taser, striking Depeiza in the chest, Depeiza pulled out the prongs of the taser and lunged at the officers again. Jackson Decl. ¶ 12. Johnson backed up, and Jackson tried to hit Depeiza with her ASP baton. Id.; Jackson Dep. at 99.

According to Plaintiffs, Jackson attempted to strike Depeiza with her ASP baton only "to stop [Depeiza] from fleeing and effectuate an actual arrest," not because Depeiza posed a danger to the officers. See Pls.' Opp'n at 13. Plaintiffs contend that there is evidence that Jackson did not think she was in danger when Depeiza "attempted to move past her when heading back down the stairway." [12] Id. However, in her Declaration, Jackson states that Depeiza suddenly began to

---

subject removed the Taser wires. The male subject continued to lunge towards the female officer.").

[12] Plaintiffs repeatedly assert that Jackson did not believe that Depeiza posed an imminent danger. See, e.g., Pls.' Opp'n at 13, 15. This is both contradicted by the evidence and not outcome determinative. "The reasonableness inquiry is also an objective one. 'The question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" Jackson v. Sauls, 206 F.3d 1156, 1170 (11th Cir. 2000) (alteration accepted) (quoting Graham, 490 U.S. at 397).

stand up aggressively as if preparing to lunge toward her and Johnson. Jackson

Decl. ¶ 12. Then, after Johnson tased him, Depeiza pulled out the taser prongs and

lunged at the officers again. Id. Johnson backed up, and Jackson tried to hit

Depeiza with her ASP baton. Id.; Jackson Dep. at 99.

Plaintiffs contend that Jackson initiated the use of force against Depeiza "to

stop him from fleeing and effectuate an actual arrest at a time when he had

exhibited no violent words or conduct towards her, Cpl. Johnson or Sgt. Eric

Seabolt." Pls.' Opp'n at 13. Plaintiffs cite to Jackson's Deposition, wherein she

testified that Depeiza could have pushed past her and Johnson in an attempt to flee.

Id. (citing Jackson Dep. at 110). However, Plaintiffs selectively cite to a portion of

the deposition testimony and ignore Jackson's testimony immediately prior to the

citation:

> Q.    Okay.  Did you find any – Did you consider Mr. Depeiza's
> getting up in the manner which he did to be threatening?
> A.    Yes.
> Q.    How so?
> A.    Like I said, he – he got up in an aggressive manner.  I mean, it
> was just the look on his face.  His body was like, okay, let's go.  I mean,
> that's just – I've seen that exact thing before.  I mean, I don't know how
> else to explain that.

Jackson Dep. at 110. Jackson also testified as follows:

> Q.    When Mr. Depeiza got up at that particular point in time, did you
> believe there was a threat of harm to you physically?

> A.      I felt that it could have been – like I said, I felt that there was a warning – that it was aggressive to where it was going to be a fight.
> Q.      Okay.
> A.      Just in his actions.

Id. at 111-12.  Rather than indicate that Depeiza was not a threat, this evidence indicates that Depeiza was both attempting to flee and posed an immediate threat to Jackson and Johnson's safety.

Plaintiffs also contend that there is evidence that after Johnson deployed his taser, but before Jackson attempted to strike Depeiza with her ASP baton, Depeiza retreated.  Pls.' Opp'n at 10, 14 (citing Jackson Dep. at 99).  Plaintiffs misread Jackson's Deposition testimony.  Jackson testified that Johnson, not Depeiza, backed up:

> Q.      And Mr. Depeiza after pulling out the prongs, what did you observe Corporal Johnson do?
> A.      He backed all the way up, and that's when I went to go strike him with my ASP baton and got kicked in the face.
> Q.      Okay.  Corporal Johnson backed all the way up.  He backed all the way up to what?  Did he go down to landing two?
> A.      He went to – We were on the landing and he went to the step, so I kind of took his place where he was at and went to strike him at the bottom of the steps going to the last landing.

Johnson Dep. at 99.  Rather than indicate that Depeiza backed up after being tased, the evidence shows that Depeiza pulled out the taser prongs and lunged at the officers again.  See Jackson Decl. ¶ 12; Jackson Dep. at 16 ("[Depeiza] grabbed the prongs out of his chest and then he went to jump down again.").  There is no

evidence in the record that Depeiza backed up or otherwise retreated after he was tased. Contrary to Plaintiffs' assertion, there is no factual dispute on this issue. See generally Pls.' Opp'n at 15.

As Plaintiffs point out, it is true that Jackson testified at her deposition that before Depeiza stood up, Depeiza had not "engaged in any violent activity" towards the officers, Depeiza's actions were an attempt to get away from the officers, and both of Depeiza's hands were visible. See id. at 94, 112 (citations omitted). However, the fact that Depeiza apparently was unarmed and had not previously posed a threat to Jackson's safety does not mean that Depeiza did not later pose a threat when he stood up aggressively, lunged at the Jackson and Johnson, was impervious to a taser, and lunged at Jackson and Johnson again.

Furthermore, accepting that Depeiza's movement toward Johnson and Jackson after Depeiza stood up was another attempt to flee, Jackson's attempt to hit Depeiza with her ASP baton was not *per se* unreasonable. See generally Morton, 707 F.3d at 1281. Plaintiffs imply that since Depeiza did not have a weapon and was attempting to push past Jackson and Johnson to evade arrest, Jackson was constitutionally required to let Depeiza escape. See Pls.' Opp'n at 13-14. That is not the law. See Graham, 490 U.S. at 395-95 ("Fourth Amendment jurisprudence has long recognized that the right to make an arrest or

investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.").

At the time Jackson attempted to strike Depeiza, in addition to the circumstances detailed earlier that had created a reasonable suspicion to detain and question Depeiza in the first instance, Depeiza had not complied with the officers' orders, had attempted to flee, was impervious to a taser, and was lunging at the officers. Under these circumstances, Jackson's attempt to strike Depeiza with her ASP baton was not unconstitutionally excessive force. See Benton v. Hopkins, 190 F. App'x 856, 860 (11th Cir. 2006) (holding that it was not excessive force to strike two or three times with an ASP baton a suspect who, after being administered pepper spray, fell onto another officer); see also Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (holding that it was not excessive force to taser a motorist who refused to comply with verbal commands, repeatedly yelled at the officer, and moved around and paced in agitation).

Plaintiffs also contend that Jackson's shooting of Depeiza violated the Fourth Amendment. Pls.' Opp'n at 17. In the deadly force context, the Eleventh Circuit has observed that a police officer may constitutionally use deadly force when the officer:

> (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has

committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible.

Robinson v. Arrugueta, 415 F.3d 1252, 1255 (11th Cir. 2005) (quoting Vaughan, 343 F.3d at 1329-30) (internal quotations omitted). "Although these factors are useful, we cannot apply them mechanically, and we must still slosh our way through the factbound morass of reasonableness." Morton, 707 F.3d at 1282 (citations and internal quotations omitted). "As to deadly force, a police officer may use such force to dispel a threat of serious physical harm to either the officer or others, or to prevent the escape of a suspect who threatens this harm." Hammett v. Paulding Cty., 875 F.3d 1036, 1048 (11th Cir. 2017) (citation and internal quotations omitted); see also Singletary v. Vargas, 804 F.3d 1174, 1181 (11th Cir. 2015) (citing Robinson, 415 F.3d at 1256) ("We have held that it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has 'probable cause to believe that his own life is in peril.'").

Jackson contends that her use of deadly force was reasonable because Depeiza posed an imminent threat of serious physical harm to Jackson. Jackson's Am. Br. at 21. The Court agrees. Jackson did not successfully strike Depeiza with her ASP baton. As Jackson tried to do so, Depeiza kicked her in the face. Jackson Decl. ¶ 12; Jackson Dep. at 99. Depeiza pressed Jackson into the railing and

punched Jackson in the face and body repeatedly. Jackson Decl. ¶ 12; Jackson

Dep. at 101-02. Jackson attempted to block her head and strike Depeiza with her

ASP baton, but Depeiza grabbed the ASP baton from Jackson and threw it away.

Jackson Decl. ¶ 12; Jackson Dep. at 101-02. Depeiza moved away from Jackson

once and was then quickly back on Jackson. Jackson Decl. ¶ 13.

Depeiza grabbed Jackson from the side around her shoulders and Jackson

felt her feet begin to lift off the ground. Id. Jackson believed Depeiza was about

to throw her over the railing to the ground and was in fear for her life. Id.; Jackson

Dep. at 147. Jackson and Depeiza were two-and-a-half stories above the ground

and there was a concrete sidewalk below them. Pls.' Resp. to Jackson's SUMF

¶ 80. Jackson managed to reach her holstered service weapon, pointed it across her

body, and fired once. Jackson Decl. ¶ 14. Because Depeiza did not let go, Jackson

believed she had missed Depeiza and Jackson fired a second time. Id. The second

gunshot struck Depeiza in the abdomen; he let go of Jackson and slumped to the

floor. Id.

Under these circumstances, it was objectively reasonable for Jackson to

twice shoot Depeiza. See McCormick v. City of Ft. Lauderdale, 333 F.3d 1234,

1246 (11th Cir. 2003) ("Because the Constitution permits the use of deadly force to

prevent a violent suspect from escaping, the Constitution must also permit the use

of deadly force against a suspect who poses not merely an escape risk (because he is not yet in police control), but also an imminent threat of danger to a police officer or others."); Martinez v. City of Pembroke Pines, 648 F. App'x 888, 893 (11th Cir. 2016) (finding that the unarmed suspect who resisted arrest, ignored verbal warnings, had struck an officer with handcuffs, and was impervious to a taser posed an imminent threat of violence to the officer when the officer shot him).

Plaintiffs contend that Depeiza was no longer a threat to Jackson when Jackson shot him because Johnson had restrained Depeiza. Pls.' Opp'n at 15-16. Plaintiffs contend that Depeiza was no longer a threat when Jackson fired because "his left arm was being held by Cpl. Johnson and his collar was also being held by Cpl. Johnson." Id. at 8, 15-16 (citing EPPD Narrative #36; Johnson Recording at 10:56-11:43, 26:43). Here again, Plaintiffs' cited evidence does not create a genuine dispute of material fact.

In her Declaration, Jackson states that she believes Johnson hit Depeiza from behind because Depeiza moved away from Jackson once and was then quickly back on Jackson. Jackson Decl. ¶ 13. At her Deposition, Jackson also testified that "I know at some point Corporal Johnson hit [Depeiza] because I felt him

leave. But when he came back, he was still delivering blows to me." Jackson Dep. at 102. In his EPPD Narrative, Johnson wrote:

> When the subject saw Ofc. Jackson holding the ASP baton, he grabbed it and threw her to the wall of the stairway and proceeding to attack her. Cpl. Johnson grabbed the subject around the arm and hoodie collar in an attempt to free Ofc. Jackson from him. While fighting the subject, Ofc. Jackson drew her departmental issued service weapon and delivered several rounds to the body of the subject.

EPPD Narrative #36. During his GBI interview, Johnson stated that he went up behind Depeiza, grabbed Depeiza by his collar and left arm, and tried to pull Depeiza off Jackson. Johnson Recording at 10:50-11:13, 26:40-26:52. Furthermore, according to the GBI's investigative summary of Johnson's interview, "JACKSON had her ASP baton out, DEPEIZA slammed her against the wall and took it from her. Once against the wall, DEPEIZA began punching JACKSON. JOHNSON grabbed DPEEIZA by his collar and left arm. While grabbing DEPEIZA, JOHNSON heard two (2) gunshots. DEPEIZA continued fighting JACKSON." Johnson GBI Summary at 4.

This evidence is consistent with Jackson's statements in her Declaration and Deposition that Depeiza moved away from or left her and was then back on her. See Jackson Decl. ¶ 13; Johnson Dep. at 102. There is no evidence that Johnson succeeded in either freeing Jackson from Depeiza or restraining Depeiza. There is no evidence that Johnson's actions prevented Depeiza from grabbing Jackson

around the shoulders and beginning to lift Jackson off the ground. See Jackson Decl. ¶ 13. That Johnson unsuccessfully tried to restrain Depeiza, or even pulled him off Jackson for a short time, does not make Jackson's subsequent use of deadly force once Depeiza was quickly back on her unreasonable; rather, it further demonstrates the extent of the threat that Depeiza posed to Jackson, despite Johnson's attempts to restrain Depeiza.

Plaintiffs also contend that an alleged discrepancy between Jackson's and Johnson's descriptions of Johnson's location at the time of the shooting creates a genuine dispute of material fact. See Pls.' Opp'n at 16. At her deposition, Jackson testified that she, Johnson, and Depeiza were all on the landing halfway between levels two and three when she shot Depeiza. Jackson Dep. at 104. Jackson testified that Johnson was "on the same landing," but "wasn't with us." Id. at 104-05. A sketch Jackson made for the GBI [Doc. 51-7] shows Jackson and Depeiza close together at one end of the landing, and Johnson in the middle on the landing. Plaintiffs contend that Jackson's description of Johnson's location at the time of the shooting "represents a complete contradiction of Cpl. Johnson's statements." Pls.' Opp'n at 16-17. Which of Johnson's statements this allegedly contradicts is unclear, as is the significance of any actual discrepancy. The evidence indicates that Johnson unsuccessfully attempted to remove Depeiza from

Jackson, and that Depeiza was quickly back on Jackson. Whether Johnson was immediately behind Depeiza or further away in the middle of the landing when Jackson fired is immaterial.

Neither Jackson's attempt to hit Depeiza with her ASP baton nor Jackson's shooting of Depeiza constitute excessive force in violation of the Fourth Amendment. Jackson and the other officers lawfully attempted to conduct an investigative Terry stop: they had reasonable suspicion that Depeiza had assaulted Graham and there was a warrant for Depeiza's arrest. However, Depeiza resisted the officers, attempted to flee, was impervious to a taser, grabbed Jackson's ASP baton and threw it way, kicked Jackson in the face and punched Jackson in the face and body repeatedly, was unable to be restrained by Johnson, and began lifting Jackson off the ground in an apparent attempt to throw Jackson off the stairway landing two-and-a-half stories above the ground onto a concrete sidewalk below. Depeiza posed an imminent threat of serious physical harm (if not death) to Jackson, and Jackson's use of deadly force was reasonable and constitutionally permissible.[13] Because Jackson was performing a discretionary function, and

_____

[13] Even if the undisputed material facts somehow show that Jackson violated some constitutional right of Depeiza's (which the Court finds they do not), Plaintiffs have failed to establish that there was a violation of a clearly established right. See generally Pls.' Opp'n at 17-22; Morton, 707 F.3d at 1283 ("Like Garner, then, Vaughan gave fair warning that the use of deadly force against a non-resisting

Plaintiffs have failed to show that Jackson violated Depeiza's constitutional rights,

Jackson is entitled to qualified immunity against Plaintiffs' federal claims.[14]

## C.   State Law Claims Against Jackson

Plaintiffs bring state law negligence and wrongful death claims, which

Jackson contends are barred by official immunity.  Jackson's Am. Br. at 23.

In relevant part, the Georgia Constitution provides:

> [A]ll officers and employees of the state or its departments and agencies may be subject to suit and may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions.  Except as provided in this subparagraph, officers . . .  shall not be subject to suit or liability, and no judgment shall be entered against them, for the performance or non performance of their official functions.

---

suspect who posed no danger violates a suspect's Fourth Amendment right to be free from excessive force.").  Moreover, the cases cited by Plaintiffs involve facts clearly distinguishable from those in this case.  See, e.g., Salvato v. Miley, 790 F.3d 1286, 1293 (11th Cir. 2015) (unreasonable to use deadly force against an apparently unarmed, retreating suspect who was outside of striking distance and did not pose an immediate threat); Priester v. City of Riviera Beach, 208 F.3d 919, 927 (11th Cir. 2000) (unreasonable to order and allow a police dog to attack and bite a suspect who complied with orders to get down on the ground, was not attempting to flee or resist arrest, and did not pose a threat of bodily harm to the officers or to anyone else).

[14] Accordingly, Plaintiffs' attorneys' fees claim (Count II) also fails as a matter of law since Plaintiffs are not a "prevailing party" under Section 1983.  See generally 42 U.S.C. § 1988.

GA. CONST., art. I, § 2, ¶ IX(d) (emphasis added). "Stated succinctly, a public officer or employee may be personally liable only for <u>ministerial acts negligently performed</u> or <u>acts performed with malice or an intent to injure</u>." <u>Graham v. Cobb Cty.</u>, 316 Ga. App. 738, 742 (2012) (emphasis added).

"Under Georgia law, the decisions of law enforcement officers to investigate, detain, arrest, use force, and charge a suspect with a crime are discretionary functions for purposes of official immunity." <u>Thomas v. Cobb Cty.</u>, No. 1:05-CV-2977-CAP, 2009 WL 10696736, at *4 (N.D. Ga. Feb. 20. 2009) (citing <u>Tittle v. Corso</u>, 569 S.E.2d 873, 876 (2002); <u>Outlaw v. Nasworthy</u>, 551 S.E.2d 785, 788 (2001); <u>Woodward v. Gray</u>, 527 S.E.2d 595, 600 (2000); <u>Todd v. Kelly</u>, 535 S.E.2d 540, 542 (2000)). "Thus, the actions taken by [Jackson] in this case were discretionary in nature. Therefore, in order to pierce [Jackson]'s official immunity, the plaintiff must demonstrate actual malice." <u>Id.</u> (citing <u>Merrow v. Hawkins</u>, 467 S.E.2d 336, 338 (1996)).

"Unlike qualified immunity under federal law, we must inquire into [the public agent's] subjective intent to determine whether he [or she] has official immunity under Georgia law." <u>Jordan v. Mosley</u>, 487 F.3d 1350, 1357 (11th Cir. 2007).

Actual malice requires <u>a deliberate intention to do wrong</u> and express malice or malice in fact. Actual malice does not include implied malice

35

or the reckless disregard for the rights and safety of others. A deliberate intention to do wrong such as to constitute the actual malice necessary to overcome official immunity must <u>be the intent to cause the harm suffered by the plaintiffs</u>. Likewise, "[t]he phrase 'actual intent to cause injury' has been defined in a tort context to mean an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury. This definition of intent contains aspects of malice, perhaps a wicked or evil motive."

<u>Selvy v. Morrison</u>, 292 Ga. App. 702, 704-05 (2008) (emphasis added) (quoting <u>Kidd v. Coates</u>, 271 Ga. 33 (1999)); <u>see also</u> <u>Adams v. Hazelwood</u>, 271 Ga. 414, 415 (1999) ("Actual malice requires more than harboring bad feelings about another. While ill will may be an element of actual malice in many factual situations, its presence alone cannot pierce official immunity; rather, ill will must also be combined with the intent to do something wrongful or illegal.").

Plaintiffs contend that "there is credible evidence" that Jackson acted with actual malice when she fatally shot Depeiza. Pls.' Opp'n at 23. According to Plaintiffs, Jackson intentionally shot "a non-deadly fleeing suspect." <u>Id.</u> at 25. As they did when responding to Jackson's contention that she is entitled to qualified immunity, Plaintiffs again state that Depeiza was "moving away from" Jackson and Johnson and that Jackson "shot Depeiza without any warning after Cpl. Johnson removed the threat from her." <u>See</u> <u>id.</u>

As explained above, there is no evidence that Depeiza was moving away from the officers when he was shot or that Johnson successfully removed Depeiza

from Jackson. There is no evidence that Jackson deliberately intended to do something wrongful or illegal. Jackson believed that Depeiza was about to throw her over the railing to the ground and was in fear for her life. Jackson Decl. ¶ 13; Jackson Dep. at 17, 147. Jackson used deadly force in self-defense; she reasonably believed that Depeiza posed an immediate threat of physical violence to her. Accordingly, Jackson is entitled to official immunity against Plaintiffs' state law claims. See Hart v. Logan, 664 F. App'x 857, 864 (11th Cir. 2016) (quoting Kidd, 271 Ga. at 33) ("Accordingly, 'an officer who, in the performance of his [or her] official duties, shoots another in self-defense is shielded from tort liability by the doctrine of official immunity.'").

## IV.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendant Officer Janet Jackson's Motion for Summary Judgment [Doc. 45] is **GRANTED**, Defendant Officer Janet Jackson's Motion to File Out-of-Time Affidavit in Support of Her Motion for Summary Judgment [Doc. 46] is **DENIED AS MOOT**, and Defendant's Motion to Strike [Doc. 62] is **DENIED**.

It is further **ORDERED** that the claims against Officer John Doe are **DISMISSED WITHOUT PREJUDICE**.

The Clerk **DIRECTED** to enter judgment for Defendant Officer Janet

Jackson and to close the file.

**IT IS SO ORDERED** this 6th day of July, 2019.

_____
MARK H. COHEN
United States District Judge